*Wallace D. Lewis v. State of Maryland*, No. 614, Sept. Term 2023. Opinion by Eyler, Deborah S., J.

**FIRST-DEGREE ASSAULT – BATTERY TYPE – INTENT TO INFLICT SERIOUS BODILY INJURY – CRIME CANNOT BE COMMITTED WITH *MENS REA* OF RECKLESSNESS – JURY INSTRUCTION ALLOWING FINDING OF *MENS REA* OF RECKLESSNESS WAS LEGALLY INCORRECT – ERROR WAS NOT HARMLESS BEYOND A REASONABLE DOUBT.**

The appellant stabbed the victim, seriously injuring him. He was charged with first-degree assault only. The evidence at trial included portions of a video from a camera on an exterior wall near the location of the stabbing. A slow-motion version of one such portion was moved into evidence over objection. Immediately after the stabbing, the appellant and his wife drove away from the scene. They did not return when contacted by the wife's daughter and asked to do so and did not respond to phone calls from the police. A jury convicted the appellant of first-degree assault. On appeal he argued that the jury instruction on first-degree assault was legally incorrect because it allowed for a finding of guilt based on a *mens rea* of recklessness. He also argued that the court abused its discretion in admitting the slow-motion video, in giving an instruction on flight, in denying an instruction on mutual affray, and in prohibiting evidence that one of the police officers on the scene did not want to accompany the appellant in the ambulance because he might punch the appellant.

*Held*: Judgment vacated and case remanded for further proceedings. The trial court abused its discretion by giving a legally erroneous jury instruction. The appellant was charged with the battery form of assault, elevated to first-degree assault by the intent to cause serious physical injury. That crime requires proof of specific intent and cannot be committed unintentionally, that is, with the *mens rea* of recklessness. The instruction as worded would permit a conviction upon a finding of recklessness only. The State confessed error but argued harmlessness because, although one element in the instruction would allow a finding of guilt based on recklessness, another element required a finding of intent. The Court held that this internal inconsistency created a confusing ambiguity. Jurors could not be expected to discern which part of the instruction was correct and which was incorrect. The State further argued that, in some circumstances, the same inconsistent language could be present in the combined instruction for first- and second-degree assault when both are charged, and therefore the error was harmless. The Court held that, at most, this might be a reason to revise the combined instruction. It does not show that, for a charge of first-degree assault, battery modality with intent to cause serious physical injury, a jury instruction permitting a finding of guilt on a *mens rea* of recklessness was harmless beyond a reasonable doubt.

The Court addressed the remaining issues on appeal for guidance on remand. The trial court did not abuse its discretion by admitting a slow-motion portion of a video that already

had been admitted in its original form without objection.  The evidence at trial supported the giving of an instruction on flight and did not support an instruction on mutual affray, which was not generated by the evidence and, as stated, was legally correct. Finally, the court did not abuse its discretion or violate the appellant's right to confrontation by not allowing irrelevant evidence that a police officer on the scene did not want to ride in the ambulance with the appellant because he might punch the appellant.

Circuit Court for Montgomery County
Case No: C-15-CR-22-000131

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 614

September Term, 2023

_____

WALLACE D. LEWIS

v.

STATE OF MARYLAND

_____

Wells, C.J.,
Leahy,
Eyler, Deborah S.
   (Senior Judge, Specially Assigned),

JJ.

Opinion by Eyler, J.
_____

Filed: November 6, 2024

* Tang, Rosalyn, J. did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

A jury in the Circuit Court for Montgomery County convicted Wallace D. Lewis, the appellant, of first-degree assault. The court sentenced him to twenty-five years' imprisonment, with all but fifteen years suspended. He noted this timely appeal, presenting five questions, which we have combined, reordered, and modified:

I.      Did the trial court abuse its discretion by:
(a) including in the jury instruction on first-degree assault language stating that a finding of guilt could be based on a reckless act?
(b) giving a jury instruction on flight?
(c) denying a requested jury instruction on mutual affray as a defense to a charge of assault?

II.     Did the trial court abuse its discretion by admitting in evidence a modified surveillance video?

III.    Did the trial court violate the appellant's due process right to present a defense by restricting cross-examination and excluding a defense witness?

We answer "Yes" to question I.(a) and on that basis vacate the conviction and remand for further proceedings not inconsistent with this opinion. Because the remaining issues may arise on remand, we shall address them as well.

**FACTS AND PROCEEDINGS[1]**

This case arises from the stabbing of Aaron Davis on May 15, 2020, outside 8609 Flower Avenue, in Takoma Park. Mr. Davis was living in an apartment there with his child, P., P.'s mother Shivalla Jackson,[2] Ms. Jackson's eight-year-old daughter, K., and his

---

[1] Our recitation of facts is based on the evidence adduced at trial.

[2] Shivalla Jackson's first name is spelled in various ways in the record.

mother and father.  K.'s father is Charles Wilson; Kitty Watson is Mr. Wilson's mother;[3] and the appellant is Ms. Watson's husband.

On the day in question, Mr. Wilson asked Ms. Watson to pick K. up from the Flower Avenue address.[4]  Neither Ms. Watson nor the appellant had ever been there before.

Mr. Davis testified that in the early afternoon, he was outside walking home when, to his surprise, he saw Ms. Watson standing on his front stoop and the appellant "coming after."  Mr. Davis walked up, "grabbed" P., and took her to the park.  He and the appellant "exchanged words."  The front yard of the Flower Avenue address is fenced, with a gate.  The appellant followed him outside the gate, telling him to put the girl down and "come holler" at him.  Mr. Davis left with P. but "felt unease[.]"

Less than thirty minutes later, Mr. Davis returned home with P.  Ms. Watson and the appellant still were there.  Mr. Davis did not know why, and "became agitated[.]"  He, Ms. Watson, and the appellant engaged in a "verbal altercation" that lasted "a few minutes or so."  The appellant suggested that K. was not being cared for properly and Mr. Davis responded that the appellant had no reason to be there and "don't worry about what's going on in this household.  These kids are taken care of."  Mr. Davis knew that Ms. Watson had

---

[3] Ms. Watson was charged with first-degree assault and conspiracy to commit first-degree assault in connection with the underlying events in this case.  The jury acquitted her on both counts.

[4] Mr. Wilson testified that he was supposed to pick up K., but Ms. Jackson called him to say there had been a domestic dispute between her and Mr. Davis that morning.  For that reason, Mr. Wilson asked his mother to pick up K.  In his testimony, Mr. Davis denied that there was a domestic dispute, explaining that he had called the police because Ms. Jackson was not letting him take P. to the park, but the police left shortly after arriving, saying it was a "civil matter."

2

sent $20 for K. and said to her, "these kids need more than $20." At that point, Ms. Watson and the appellant "grew hostile and irate[,]" became "[m]ore violent," and there was "more yelling." Mr. Davis "screamed back at them" and told them to get off his property. They did so and waited across the street. Mr. Davis went inside and learned that Ms. Watson and the appellant were there to pick up K., that K. already was in their car, and that Ms. Jackson was outside by that car.

Mr. Davis went back outside. The appellant met him at the front gate. They were face to face and the appellant had his hands behind his back. Then, one of the appellant's hands came "overhand" to the top of Mr. Davis's earlobe, making contact, which Mr. Davis said felt like a slap on his face. Mr. Davis "struck back" with a "right punch" that caused the appellant to fall into the street on his hands and knees. Mr. Davis felt the appellant grab his legs with both arms. Mr. Davis reacted by hugging him, hoping that would loosen his grip. He heard the appellant say, "baby, get the knife" and saw "something black shaped as a knife on the ground[.]" On the periphery, he saw Ms. Watson run for his left side. As he continued to punch the appellant, he felt two punches to his back, and then felt his "arms give up."

Realizing it was "two against one[,]" Mr. Davis tried to run away. He saw blood but did not know where it was coming from. He ran inside and in the bathroom mirror saw that his "face [was] cut open and a nerve exposed." Until then, he did not know that his face had been cut. He returned outside and was going to run to Washington Adventist Hospital, a few blocks away, but his mother screamed out the window that the hospital had closed. He called 911 for an ambulance because he thought he might bleed out. The

3

recording of the call was played for the jury.  In it, Mr. Davis said he had been attacked by two people who "just fled off in a car."  The ambulance arrived and transported him to the Washington Hospital Center in the District of Columbia, where he underwent surgery.  At the time of the trial, Mr. Davis had scars, was unable to "smile hard" or "laugh really very hard" because of nerve pain, his right arm was "very easily fatigued[,]" and he could not hold that arm up for a sustained period of time.

Elizabeth Lewallen lived across the street at 8608 Flower Avenue.  On the day in question, she was getting ready to take a nap at about 1 or 1:30 p.m., when she heard a commotion and looked out her window.  She saw a "bunch of people in the yard across the street" talking in loud voices and arguing.  She saw a young man she recognized as someone who lived in the house,[5] an older man dressed in a maroon "Washington" shirt, jeans, sneakers, and a baseball cap, and a woman dressed in blue and white.  The older man (the appellant) and the woman (Ms. Watson) were standing near a parked car and the younger man (Mr. Davis) was across the street standing outside his fence smoking a cigarette.  They appeared to be arguing "mainly about the little girl[.]"  Mr. Davis said "something to the effect that the young girl was more his than the other man's because he raised her from the time she was 6 months old."  Ms. Lewallen did not understand what the appellant and Ms. Watson said in response, "but it was loud."  The appellant yelled derogatory, "nasty names" at Mr. Davis.

_____

[5] Prior to this incident, Ms. Lewallen did not know Mr. Davis's name, but she learned it from the police.

4

Eventually, Mr. Davis said something along the lines of he was not going to go out into the street and if the appellant wanted to do something to him, he would have to walk to him. The appellant started walking across the street toward Mr. Davis "with purpose" and in an "aggressive" manner. The appellant hit Mr. Davis, who pushed him into the middle of the street. The appellant fell and hit his head and Mr. Davis started punching him. The appellant moved his hand down to his pocket area, "came up with a knife[,]" and cut Mr. Davis on his right side. Mr. Davis got up and had "blood pouring down his white shirt[.]" The appellant got up and went to his car. Ms. Lewallen did not see Ms. Watson do anything but heard her say to the appellant, "get in the car and let's go."

Kitty Watson testified that at about 11 a.m. that day her son called and asked her to pick up K. She and the appellant drove to the Flower Avenue address and she called Ms. Jackson to say they were on their way. They arrived a little after 1 p.m. Ms. Jackson came outside. The two women spoke while the appellant went to buy some cigarettes. At some point, Mr. Davis entered the yard, picked up P., and left. Ms. Watson described Mr. Davis as "mean-mugged."

According to Ms. Watson, when Mr. Davis returned, he said to Ms. Jackson, "I don't know why you called this old assed bitch over here. I would smack the shit out of her[.]" She (Ms. Watson) and Mr. Davis had words and things "got heated[.]" Ms. Watson told Mr. Davis he was being disrespectful to older people and women. A couple of minutes later, the appellant returned from the store. Ms. Watson, the appellant, and K. went across the street to the car and Ms. Jackson followed them. K. got into the back seat of the car and was watching videos on Ms. Watson's phone. Eventually, Ms. Jackson went inside

5

the house to get clothing for K. Mr. Davis, who was at the gate, shouted across the street and the appellant shouted back at him. Mr. Davis yelled that if the appellant needed to say something, he could come over and say it. Eventually, the appellant walked over and started talking to Mr. Davis. Ms. Watson could not hear their exact words because they were "face-to-face with each other[,]" but she described the appellant's demeanor as "calm" and "fatherly," like an "older person going to talk to a younger person" and "[t]rying to d[e]fuse the situation." Mr. Davis said, "I don't know why your old ass is over here. I will drag your old ass." The appellant "raised his voice" and the two men started fighting.

Ms. Watson saw Mr. Davis punch the appellant, causing him to fall back into the middle of the street. She got in the car with K. She did not see the appellant threaten, punch, or slap Mr. Davis or take out a knife and cut him. She acknowledged that it was not unusual for the appellant to be carrying a knife. She did not know whether the knife used to stab Mr. Davis belonged to the appellant nor did she know who stabbed him. She did not hear the appellant say, "baby, get the knife."

Ms. Watson got out of the car when she saw the appellant "trying to walk fast" and "holding his ribcage." She walked to the middle of the street, grabbed the appellant, and helped him to the car. The appellant was hurt and she "saw blood." They started to drive to a hospital, but the appellant did not want to go. About ten or fifteen minutes after they drove away, Ms. Jackson called and asked them to return. Ms. Watson told her she would return, but didn't say when. She denied receiving phone calls from the police. She and the appellant drove home. He went to the hospital a couple of days later.

6

Montgomery County Police Officer Chuck Merriman responded to the scene. He found Mr. Davis standing in the middle of Flower Avenue, smoking, holding a t-shirt to the right side of his face, and "completely covered in blood." There was a laceration from Mr. Davis's right ear to just below the right side of his mouth; a puncture wound in Mr. Davis's back, about two and one half or three inches below his shoulder; and another puncture wound under Mr. Davis's armpit. Montgomery County paramedic James Hedges testified that one wound in particular was "high-risk" because it was in a "very vascular area" and it was "very difficult" to control the bleeding. Mr. Davis was transported to Washington Hospital Center, the nearest trauma center.

Christine Trankiem, M.D., a trauma surgeon, treated Mr. Davis at the hospital. She testified that Mr. Davis was admitted under a code yellow trauma, which was "the level of injury for the highest level of trauma activation." He had a complex facial laceration from the upper edge of his lip to the front of his ear. It required a multilayered procedure involving deep stitches and then another layer of skin stitches. He also had a stab slash wound behind and beneath his right armpit. The most severe wound was located in front of Mr. Davis's right armpit, described as his right chest interior axillary injury. It required an interventional radiologist because the usual steps taken to stop the bleeding did not work. The procedure to stop the bleeding in the chest was invasive and required doctors to access that part of Mr. Davis's body through an artery in his groin.

Montgomery County Police Officer Genesis Molta testified that when she responded to Mr. Davis's 911 call, she learned that Ms. Watson and the appellant no longer were at the scene. She asked Ms. Jackson to call them, which she did. Ms. Jackson left a

7

message for them to return. Thereafter, using different cell phones, Officer Molta called a phone number she had obtained for Ms. Watson. She left a voice message on one occasion and called multiple times thereafter, but Ms. Watson never answered the phone.

Montgomery County Police Detective Brandon Patrick testified that he was dispatched to 8609 Flower Avenue at about 1:50 p.m. on the day of the stabbing. At the scene, he observed blood in the street, a knife sheath, and a trail of blood leading from the street into the house at 8609 Flower Avenue.

We shall add facts as they pertain to the issues the appellant has raised.

## DISCUSSION

### I.

Three of the appellant's issues concern jury instructions.

In Maryland, a "court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding." Md. Rule 4-325(c). A trial court's decision to give a jury instruction or not to give a jury instruction is reviewed for abuse of discretion. *Carroll v. State*, 428 Md. 679, 689 (2012); *Thompson v. State*, 393 Md. 291, 311 (2006). A trial court must give a requested instruction if it is a correct statement of the law, is generated by the evidence, and is not fairly covered by other jury instructions given by the court. *Thompson*, 393 Md. at 302 (citing Md. Rule 4-325(c) and *Ware v. State*, 348 Md. 19, 58 (1997)).

"A requested jury instruction is applicable if the evidence is sufficient to permit a jury to find its factual predicate." *Bazzle v. State*, 426 Md. 541, 550 (2012). Whether the evidence is sufficient in that regard is a question of law for the trial court. *Rainey v. State*,

8

480 Md. 230, 255 (2022). Thus, we undertake an independent review of whether the evidence at trial was sufficient to "'establish a *prima facie* case that would allow a jury to rationally conclude that the evidence supports the application of the legal theory desired.'" *Id.* (quoting *Bazzle*, 426 Md. at 550). We review the evidence in the light most favorable to the party requesting the instruction. *Id.* (citing *Dykes v. State*, 319 Md. 206, 216 (1990)). The requesting party bears the burden to produce "some evidence" to support the giving of the requested instruction. *Id.*

**(a)**

The appellant contends the trial court erred by giving a legally incorrect instruction on first-degree assault. The State concedes the court erred, but argues that the error was harmless beyond a reasonable doubt. To address harmless error, we must review the law on assault and battery and the pattern jury instructions on those crimes formulated by the Maryland State Bar Association ("MSBA") Committee on Criminal Pattern Jury Instructions.

Assault and battery were common law crimes in Maryland until 1996, when multipurpose assault and battery statutes covering the entire subject matter were enacted, abrogating the common law. *Robinson v. State*, 353 Md. 683, 694 (1999). Nevertheless, the meanings of the statutory crimes "are judicially determined," so we take guidance from case law analyzing the common law meanings. *See* Md. Code (2002, 2021 Repl. Vol.), § 3-201(b) of the Criminal Law Article ("CR") (defining "assault" to encompass "the crimes of assault, battery, and assault and battery, which retain their judicially determined meanings"). *See also Quansah v. State*, 207 Md. App. 636, 646 (2012) (explaining that

9

second-degree assault, a statutory crime, encompasses the common law crimes of assault, battery, and assault and battery).

The three modalities of assault recognized at common law – intent to frighten, attempted battery, and battery – each constitute statutory assault. *Watts v. State*, 457 Md. 419, 439 (2018). In the case at bar, we are dealing with the battery modality of assault.

CR § 3-203 prohibits second-degree assault. The battery variety of second-degree assault "is committed by causing offensive physical contact with another person." *Nicolas v. State*, 426 Md. 385, 403 (2012).[6] A battery can be an intentional or an unintentional crime. *Elias v. State*, 339 Md. 169, 183 (1995). An intentional battery is a specific intent crime: the defendant must have committed the act with the specific intent to injure the victim, even if the injury intended is slight. *Lamb v. State*, 93 Md. App. 422, 455 (1992). *See Elias*, 339 Md. at 183-84 (explaining that at common law, an intentional battery conviction required proof that the defendant "intended to cause harmful or offensive

---

[6] In *Williams v. State*, the Supreme Court of Maryland explained,

[When battery was] a common law crime, [it] was . . . defined as the "unlawful beating of another[.]" *Kellum v. State*, 223 Md. 80, 85 (1960). We have also defined common law battery as the "unlawful application of force to the person of another[,]" *Snowden v. State*, 321 Md. 612, 617 (1991), and as "'*any* unlawful force used against the person of another, *no matter how slight*[.]'" *Edmund v. State*, 398 Md. 562, 571 (2007) (quoting *State v. Duckett*, 306 Md. 503, 510 (1986) (internal citations omitted). *See also Lamb v. State*, 93 Md. App. 422, 448 (1992) (quoting R. Perkins, *Criminal Law*, 152-153 (3d ed. 1982)[)] (defining battery as "an application of force to the person of another 'by the aggressor himself, or by some substance which he puts in motion.'").

457 Md. 551, 567 (2018) (italicized portions in original).

10

contact against a person without that person's consent and without legal justification"). An unintentional battery, which is not a specific intent crime, only requires the defendant to have had the general intent to commit the criminally negligent act without any thought as to the consequences of doing so, i.e., the *mens rea* of recklessness. *Id.* at 184. "[W]hether a defendant's actions constitute gross criminal negligence/recklessness turns on whether those actions under all the circumstances amounted to a disregard of the consequences [that] might ensue to others." *Id.* *See also Duckworth v. State*, 323 Md. 532, 540 (1991).

CR § 3-202 prohibits first-degree assault. The crime requires proof of "all the elements of assault in the second-degree" and "at least one of the statutory aggravating factors" spelled out in CR § 3-202(b). *Snyder v. State*, 210 Md. App. 370, 379, *cert. denied*, 432 Md. 470 (2013). Those factors are (1) intentionally causing or attempting to cause serious physical injury to another; (2) using a firearm to assault another; and (3) assaulting another by intentional strangulation. CR § 3-202(b).

In the case at bar, the appellant was charged with first-degree assault by stabbing with a knife. He was not charged with second-degree assault. The case not only concerns the battery modality of assault but also the aggravating factor of intentionally causing a serious physical injury. This type of first-degree assault requires proof of a specific intent to inflict serious physical injury, i.e., an intent beyond that required for an intentional second-degree battery. It necessarily is an intentional assault, as intent to inflict serious physical injury is an element; therefore, the *mens rea* of recklessness does not apply and, if that is the only state of mind proven, is legally insufficient to support a conviction.

11

The Maryland Criminal Pattern Jury Instructions cover second-degree assault (MPJI-Cr 4:01), first-degree assault when the defendant is charged with both first- and second-degree assault (MPJI-Cr 4:01.1A), and first-degree assault as a "stand alone" instruction when only first-degree assault is charged (MPJI-Cr 4:01.1B). The non-stand-alone instructions divide second- and first-degree assault by the modality: intent to frighten, attempted battery, and battery.

The second-degree assault instruction for the battery modality states, in relevant part:

> The defendant is charged with the crime of assault. Assault is causing offensive physical contact to another person. In order to convict the defendant of assault, the State must prove:
>   (1) that the defendant caused [offensive physical contact with] [physical harm to] (name);
>   (2) that the contact was the result of **an intentional or reckless act** of the defendant and was not accidental; and
>   (3) that the contact was [not consented to by (name)] [not legally justified].

MPJI-Cr 4:01 (emphasis added). Thereafter, the instruction sets forth a definition of "reckless act." Thus, as worded, this instruction allows the jury to find an intentional or a reckless battery.

The first-degree assault instruction that applies when the defendant is charged with both first- and second-degree assault states, in relevant part:

> The defendant is [also] charged with the crime of first degree assault. In order to convict the defendant of first degree assault, **the State must prove all of the elements of second degree assault** and also must prove that:
>   (1) the defendant used a firearm to commit assault; or
>   (2) the defendant intended to cause serious physical injury in the commission of the assault; or
>   [(3) the defendant intentionally strangled (name)]

12

MPJI-Cr 4:01.1A (emphasis added). Definitions of a "firearm," "serious physical injury," and strangulation follow. The Notes on Use direct the court to give the second-degree assault instruction immediately prior to this instruction.

Finally, the stand-alone first-degree assault instruction states, with respect to the battery form of assault, and in relevant part:

> The defendant is charged with the crime of first degree assault. Assault means causing offensive physical contact to another person. In order to prove that the defendant committed an assault, the State must prove:
>   (1) that the defendant caused [offensive physical contact with] [physical harm to] (name);
>   (2) that the contact was the result of an **intentional [or reckless] act** of the defendant and was not accidental;
>   (3) that the contact was [not consented to by (name)] [not legally justified]; and
>   (4) that the defendant [used a firearm to commit the assault] [intended to cause serious physical injury in the commission of the assault] [committed the assault by strangling].

MPJI-Cr 4:01.1B (emphasis added). In separate brackets that follow, definitions are given for "reckless act," a "firearm," and "serious physical injury."

The Notes on Use for the stand-alone instruction direct: "**Only include the bracketed language regarding recklessness in element (2) if the battery involves a firearm**." *Id.* (emphasis added). The Comment elaborates:

> Since first degree assault is an aggravated form of second degree assault predicated on either intent to cause serious physical injury, use of a firearm, or intentional strangulation this instruction simply tracks the language of the second degree instruction with reference to the aggravators. **One potentially confusing consequence of this scheme is that it necessarily must include the possibility of a "reckless act" causing offensive physical contact or harm under the element (2) of [the battery portion of the] instruction . . . . Importantly, reckless physical contact can only constitute a *first degree* assault if it involves a firearm–serious-physical-injury type and strangulation type first degree assaults require specific intent.**

13

*Id.* (italics in original; emphasis otherwise added). By this language, the Notes on Use and Comment recognize that the two forms of first-degree assault of the battery type that do not involve using a firearm cannot be committed recklessly.[7]

In the case at bar, the evidence that the appellant used a knife to cause serious physical injury to Mr. Davis could not result in a conviction based on a *mens rea* of recklessness. The bracketed material pertaining to recklessness thus was not relevant.

The instruction the court gave the jury, however, included the language about recklessness:

> Each defendant is charged with the crime of first degree assault.[8] Assault means causing offensive physical contact to another person. In order to prove that each defendant committed a first degree assault the State must prove one that the defendant caused physical harm to Aaron Davis, two that the contact was the result of an intentional **or reckless** act of the defendant and was not accidental, three that the contact was not consented to by Aaron Davis or was not legally justified, and four that the defendant intended to cause serious physical injury in the commission of the assault.
>
> Now, **reckless act means conduct that under all circumstances shows a conscious disregard of the consequences to other people and is a gross departure from the standard of conduct that a law abiding person would**

---

[7] *Duckworth v. State*, 323 Md. 532 (1991), decided under the common law before the multipurpose assault and battery statutes were enacted, is an example of a scenario that would support a conviction for assault in the first degree by battery, committed with the *mens rea* of recklessness. The defendant recklessly handled a gun, scaring his girlfriend's daughter, who thought he was going to shoot her, and was so grossly negligent in doing so that the gun went off, shooting the little girl (but not killing her). There was no evidence that the defendant intended to cause harm to the little girl. The Supreme Court of Maryland held that he had committed an unintentional, i.e., reckless, battery. Under the present day first-degree assault statute, that defendant could be convicted of the battery form of assault, aggravated to first degree by the use of a firearm, but with a reckless state of mind.

[8] Ms. Watson also was a defendant, so the court was instructing about two defendants, not one.

**observe.** Serious physical injury means injury that one creates a substantial risk of death or two causes serious or permanent or serious and protracted disfigurement or loss or impairment of the function of any bodily member or organ. If you find that two parties agreed to mutual combat then the parties have consented to physical contact using non-excessive force.

(Emphasis added.) The defense objected to the inclusion of the language about recklessness. The court explained its decision to include that language as follows: "[T]he jury instruction is a little misleading on that because clearly, if you can be reckless with a gun, you can be reckless with a knife. It doesn't have to be intentional. It can be reckless, so."

Before this Court, the appellant argues that because no firearm was involved, first-degree assault could not be committed with the *mens rea* of recklessness, making it error for the court to include the word "reckless" in the first paragraph of the instruction and to recite the definition of reckless act in the second paragraph. He maintains that reversal is required because the legally erroneous language permitted the jury to find guilt by a lower degree of culpability than legally required. He asserts that allowing the jury to convict him based on a standard of recklessness that only applies to an unintended assault, not the intended assault he was charged with, was prejudicial error.

As noted, the State concedes that the trial court erred by including the language about recklessness in the instruction. It maintains, however, that taken as a whole, the instruction accurately communicated the demands of the law. It quotes *Carroll*, 428 Md. at 689 (quoting *Fleming v. State*, 373 Md. 426, 433 (2003)): "'[R]eversal is not required where the jury instructions, taken as a whole, sufficiently protect the defendant's rights and adequately covered the theory of the defense.'" In essence, the State is arguing

15

harmlessness, which means it must establish, beyond a reasonable doubt, that the trial court's error had no effect on the outcome of the case. *Dorsey v. State*, 276 Md. 638, 648 (1976).

The State reasons as follows on the issue of harmlessness. Notwithstanding the language about recklessness, the instruction informed the jury that to convict the defendant the State had to prove that the appellant intended to cause serious physical injury. Thus, in the State's words, the instruction "did not allow the jury to convict based on a merely reckless mens rea[,]" so the recklessness language could not have affected the verdict. The State points out that when a defendant is charged with both degrees of assault, the jury first hears the second-degree assault instruction, which includes as a required finding "that the contact was the result of an **intentional or reckless act** of the defendant and was not accidental[,]" and then hears the first-degree assault instruction, which tells them "the State must prove all of the elements of second degree assault[,]" **and** must prove "the defendant intended to cause serious physical injury in the commission of the assault[.]" (Emphases added.) In this scenario, it is possible for the jury to base a first-degree assault conviction for a battery not involving a firearm on findings that the contact was the result of a reckless act of the defendant and that the defendant intended to cause serious physical injury in the commission of the assault. This, the State argues, is no different from the incorrect first-degree assault stand-alone instruction the court gave in this case.

While the State's argument is superficially appealing, we are not convinced. The stand-alone first-degree assault instruction as given was internally inconsistent and ambiguous for the exact same reason the Notes on Use and Comment for that instruction

16

emphasize – that only when the assault involved a firearm can a conviction be based on the *mens rea* of recklessness. The jury was told via element two that the State must prove that the contact resulted from an intentional or reckless act of the appellant, and was given a detailed instruction about what recklessness means, and at the same time was told via element four that the State had to prove that the defendant intended to cause serious physical injury in committing the assault. The essence of the State's argument is that element two, and its reference to recklessness, became meaningless once element four was read, and the jurors would have realized that and ignored it and the definition of recklessness.

If jury instructions are '"ambiguous, misleading or confusing' to jurors, those instructions will result in reversal and a remand for a new trial." *Smith v. State*, 403 Md. 659, 663 (2008) (quoting *Battle v. State*, 287 Md. 675, 684-85 (1980), in turn quoting *Midgett v. State*, 216 Md. 26, 41 (1958)). *See also Wintrobe v. Hart*, 178 Md. 289, 296 (1940) ("[I]nstructions which are ambiguous, misleading[,] or confusing to jurors can never be classed as noninjurious."). We are not willing to assume, as the State asks and to the detriment of the appellant, that the jury would not have been confused by the dueling references to recklessness and intentionality, and would have known, despite the internally inconsistent language, to factor out recklessness as a state of mind on which to base a finding of guilt.

We note that the prosecutor's closing and rebuttal arguments also were confusing and ambiguous. In closing, the prosecutor, commenting upon how the appellant managed

17

to move quickly during the altercation, said: "Well, trust me when this man is motivated [he] is very quick and very intentional and very reckless." In rebuttal closing, he said,

> [W]e ask you to find the defendant guilty. He certainly caused physical harm to Aaron Davis. It was an intentional or reckless act.

On the other hand, during parts of his closing the prosecutor referred only to the appellant's having intentionally caused harm to Aaron Davis, without mention of recklessness. Certainly, nothing about the State's closing would have clarified the ambiguous instruction, and instead would have created the false impression that a finding of recklessness on the appellant's part was sufficient.

The State is correct that, depending upon the type of battery involved and the underlying facts in evidence, the same ambiguity could result when a defendant is charged with first- and second-degree assault and the court gives the second-degree assault instruction immediately followed by the first-degree assault instruction. This is not a reason for us to deem harmless the ambiguity and inconsistency in the instruction given in this case. Trial courts are strongly encouraged to use the pattern jury instructions, *see Johnson v. State*, 223 Md. App. 128, 152 (2015), and attention should be paid to the Notes on Use and Comments with respect to when to use, or refrain from using, bracketed material. Because we cannot say that the error was harmless beyond a reasonable doubt, we shall vacate the appellant's conviction and remand for further proceedings.

At trial, the defense objected to the court's giving an instruction on flight. The instruction as given stated:

> Now, flight of defendant. A person's flight immediately after the commission of a crime or after being accused of committing a crime is not enough by itself to establish guilt, but it is a fact that may be considered by you as evidence of guilt. Flight under these circumstances may be motivated by a variety of factors some of which are fully consistent with innocence. You must first decide whether there is evidence of flight. If you decide there is evidence of flight then you must decide whether this flight shows a consciousness of guilt.

Except for the substitution of "person's" for "defendant's" in the second sentence, this instruction is verbatim MPJI-Cr 3:24.

The appellant contends that flight was not generated by the evidence and therefore the trial court abused its discretion by giving a flight instruction. He argues that the evidence could not support an inference that he did anything other than depart the scene: he simply moved from the middle of the street, where he had fallen, to Ms. Watson's car, and she merely drove him and K. away because he was injured and she was trying to take care of him. He maintains this evidence was insufficient to support a finding that he fled, and therefore to support an inference that he acted with a consciousness of guilt to avoid apprehension or prosecution. He points out that Mr. Davis had told him and Ms. Watson to leave and that K. was in the car, and Ms. Watson did not want her to see the altercation or hear the arguments that were taking place.

In *Thompson*, 393 Md. at 312, the Supreme Court of Maryland explained:

> [F]or an instruction on flight to be given properly, the following four inferences must reasonably be able to be drawn from the facts of the case as

19

ultimately tried: [(1)] that the behavior of the defendant suggests flight; [(2)] that the flight suggests a consciousness of guilt; [(3)] that the consciousness of guilt is related to the crime charged or a closely related crime; and [(4)] that the consciousness of guilt of the crime charged suggests actual guilt of the crime charged or a closely related crime.

In the case at bar, the appellant's focus is on the first inference, that his behavior suggested flight. He maintains that the evidence showing he simply left the place where the stabbing happened could not support a finding of flight from which a further inference of consciousness of guilt could be drawn. The sufficiency of the evidence to show flight, and therefore to support the giving of the instruction, is a question of law that we determine *de novo*. *Bazzle*, 426 Md. at 550.

In *Hoerauf v. State*, 178 Md. App. 292 (2008), we explained:

"[E]vidence of flight is defined by two factors: first, that the defendant has moved from one location to another; second, some additional proof to suggest that this movement is not simply normal human locomotion." 22 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 5181 (1978 & SUPP. 2007). This additional proof of other than normal human movement also must reasonably justify an inference that it was done with a consciousness of guilt and pursuant to an effort to avoid apprehension or prosecution based on that guilt. In the context of leaving the scene of a crime, the classic case of flight is where a defendant leaves the scene shortly after the crime is committed and is running, rather than walking, or is driving a speeding motor vehicle. On the other hand, merely walking away from the scene of a crime ordinarily does not constitute flight.

*Id.* at 323-24 (footnote and citation omitted). In that case, we held the trial court abused its discretion by giving a flight instruction when the only evidence was that the defendant, who stood on the sidelines while the crimes were committed, simply walked away.

In the case at bar, the record discloses "some evidence" from which reasonable jurors could find that the appellant's departure from the scene constituted flight. The only

evidence that Mr. Davis told the appellant and Ms. Watson to leave was that, before the stabbing, he ordered them off his property and they responded by walking to their car. This had nothing to do with their ultimate departure from the scene. Ms. Lewallen testified that, after cutting Mr. Davis with the knife, the appellant got up and went to the car, and Ms. Watson told him, "get in the car and let's go." In his 911 call, Mr. Davis said that two people were involved in the stabbing and "[t]hey just fled off in a car." This was his lay assessment of the manner in which they departed and was not objected to. By the time the ambulance personnel and police arrived, the appellant and Ms. Watson were gone. When, in response to Officer Molta's request, Ms. Jackson called Ms. Watson and asked her to return, she said she would but did not do so. Nor did Ms. Watson answer the calls Officer Molta placed from various phone numbers in the days that followed. Even assuming the appellant suffered some injury, neither he nor Ms. Watson called 911 or the police to report the incident or seek assistance. Although Ms. Watson testified that she left to take the appellant to the hospital, he didn't seek medical care for several days, so he could not have been seriously wounded.

The record discloses some evidence that, when viewed in the light most favorable to the State as the proponent of the requested instruction, was legally sufficient to allow reasonable jurors to find that the appellant didn't merely depart the scene as one ordinarily would do, but fled the scene, thus permitting an inference that he did so out of consciousness of guilt relating to the stabbing of Mr. Davis. To be sure, a reasonable jury could have found that he did not flee. So long as there was "some evidence" to support the

21

predicate for giving the instruction – flight from the scene – the court did not err in granting the flight instruction, however.

**(c)**

Lastly, with respect to jury instructions, the appellant contends the trial court erred by declining to give a non-pattern instruction on mutual affray, which he maintained would guide the jury in deciding whether Mr. Davis had consented to the battery. The requested instruction read:

> In determining whether an individual "consents" to an assault, you may consider whether there exists evidence of mutual combat or mutual affray. A mutual affray occurs when both parties willingly enter into a fight. In the case of a mutual affray it does not matter which combatant actually strikes the first blow. In fact, if both parties intend to fight and are ready to do so, it may be a mutual affray even if one party did not actually strike any blow.
>
> If you find that Aaron Davis had the intention of engaging in physical combat with [the appellant], you must find that Aaron Davis consented to the combat. If you find that Aaron Davis consented to the combat, you must find [the appellant] not guilty of first-degree assault.

During a bench conference, defense counsel argued that "[m]utual affray is a defense to assault because it means there was consent." She asserted that if the jury found that Mr. Davis agreed to a physical altercation with the appellant, and the degree of force the appellant used during the mutual altercation was not excessive, the appellant could not be guilty of assault. Counsel argued, "I think that the jury is entitled to know that mutual – when two parties agree, I'm going to fight you. You're going to fight me. We're going to have a fight, that is consent." Counsel acknowledged that mutual affray is a crime in and of itself, separate from assault, but argued that the "mutual part talks about the consent, and that consent negates an element of assault." She pointed out that Ms. Watson testified

22

that Mr. Davis threw the first punch and that Ms. Lewallen testified that Mr. Davis was not slashed when the appellant first approached him, but only later, after the appellant was on the ground being punched repeatedly.

The trial judge noted that the first-degree assault instruction already included language about lack of consent. The court declined to give the requested instruction but added a sentence to the end of the first-degree assault instruction stating, "[i]f you find that two parties agreed to mutual combat then the parties have consented to physical contact using non-excessive force." Defense counsel excepted to the ruling.

On appeal, the appellant argues that "all of the requirements of Md. Rule 4-325 were met in that the requested instruction stated the applicable law, was generated by the evidence, and was not fairly covered by other instructions." We disagree.

Affray is a common law crime consisting of "the fighting of two or more persons in some public place to the terror of the people[.]" *Hickman v. State*, 193 Md. App. 238, 242 (2010) (quotation marks omitted). One of the principal differences between an affray and a common law assault is that the victim of an affray is the public, not an individual, and its criminalization is to protect the peace. *Id.* at 252-53. As a result, the defense of consent is irrelevant with respect to an affray. An affray does not require the agreement or consent of the fighting parties.

In *Hickman*, in discussing a trial court's decision to acquit a defendant of second-degree assault but convict him of common law affray, we explained:

> The court found that [the defendant] and Gregor "squared off" in the parking lot, engaged in threats and that [the defendant] hit Gregor twice, ultimately delivering the blow that caused the victim's demise. The court

23

likewise found, however, that Gregor entered the parking lot with the intention of engaging in combat and, thus, consented to the assault. This "consent" prevented the court from finding [the defendant] guilty of second-degree assault, although [his] actions satisfied all other elements of the offense. The court continued, explaining that the defense of consent does not apply to the common law offense of an affray. Consent, the court observed, is irrelevant regarding the affray, *see State v. Renda*, 125 Me. 451, 134 A. 571 (1926); *see also* 2A C.J.S. *Affray*, § 8 (stating that "At common law an affray does not require an agreement or consent of both parties to fight …." ) and likewise in situations of mutual combat. *See* 6 Am. Jur. 2d *Assault and Battery*, § 53 (citing *Hodges v. Schuermann Bldg. & Realty Co.*, 174 S.W.2d 909 (Mo. Ct. App. 1943); *State v. Dunham*, 118 Ohio App. 3d 724, 693 N.E.2d 1175 (1st Dist. Hamilton County 1997)). Thus, the trial court, having determined that [the defendant] had struck the fatal blows, adequately explained why [his] conduct was sufficient to be "fighting" or "mutual combat" under the common law offense of affray. The court, however, properly acquitted [him] of the statutory offense of second-degree assault.

*Id.* at 257-58.

There was no charge of mutual affray in this case, and therefore the evidence did not generate an instruction on that crime; and beyond that, the requested instruction misstated the law with respect to affray and the requirement of consent for that crime. It would have informed the jury that a "mutual affray occurs when both parties willingly enter into a fight." Because, with respect to affray, Maryland law does not require an agreement or consent of both parties to fight, the proposed jury instruction did not correctly state the applicable law and the trial judge did not abuse its discretion in deciding not to give it. The court properly declined to give a legally incorrect instruction on a crime that was not charged and was not relevant to the crime that was charged.

The appellant also argues that the requested instruction on mutual affray "would have informed the jury – in a way that the assault instruction on the elements of assault did not – that its inquiry into whether Mr. Davis consented extended to his deeds." We reject

24

that argument because nothing in the proposed instruction would have conveyed that information to the jury.

**II.**

The appellant contends the trial court erred by admitting in evidence State's Exhibit 23, a slow-motion version of surveillance video footage Detective Patrick obtained at the scene. He asserts that the video was not properly authenticated.

Upon responding to the scene, Detective Patrick learned that a video surveillance camera was attached to the front of 8609 Flower Avenue. He contacted the landlord and obtained access to the building, where he located a server in the basement and an "older" video surveillance system. He was able to view and "pull the video surveillance from the incident." He was not able to retrieve all the video from the surveillance system, but he "captured a majority of the incident from the time of [the appellant's] and Ms. Watson's arrival, to when the incident occurred."

At trial, portions of the video were admitted in evidence as State's Exhibit 24, which showed surveillance footage from 1:07 to 1:16 p.m., and State's Exhibit 25, which showed surveillance footage from 1:34 to 1:37 p.m. In addition, a still shot with a time stamp of 1:05 p.m., taken from the surveillance video, was admitted as State's Exhibit 17. These exhibits were admitted without objection.

State's Exhibit 23 was identical to State's Exhibit 25, but in slow motion. Detective Patrick testified that State's Exhibit 23 was a fair and accurate picture of what he had observed on State's Exhibit 25. When the prosecutor sought to admit State's Exhibit 23, defense counsel objected on the ground that "there is no business line authenticating it[,]"

that the defense did not "believe it's from the original source[,]" and that the defense had "no idea who slowed it down" or "how they did it." The trial judge allowed State's Exhibit 23 to be admitted "assuming that it's authenticated, who did the slowing down so it's a proper, other than the slowing down, because the slowing down is not the original so." The following testimony ensued:

> [Prosecutor]: Can you tell the ladies and gentlemen of the jury how this video was slowed down?
>
> [Detective Patrick]: It was slowed down to a, essentially a slower version of this instead of it being a, in real time full speed. It's slowed down not necessarily frame by frame, but in a slower motion, so you can see what occurred at a slower speed than was captured in the video surveillance itself.
>
> [Prosecutor]: And during that process, did anything change or was it substantially altered from what you originally viewed on May 15th, 2020?
>
> [Detective Patrick]: It was not.
>
> [Prosecutor]: State moves to admit State's 23 into evidence.
>
> [Defense Counsel]: Your Honor, I continue my objection. I have no idea who did it. I have no idea how it got slowed down, or what the process that was actually used was, and nor do I know that the detective knows.
>
> THE COURT: Okay. Was this done at the police lab, or was this done at the scene? Who did the slowing down?
>
> [Detective Patrick]: I believe it was the State's Attorney's Office that slowed it down, Your Honor.
>
> THE COURT: Okay. And other than the slowing down, is there any other changes to the video?
>
> [Detective Patrick]: No, Your Honor.

The trial judge then voiced his intention to overrule the objection and defense counsel asked to approach. At the bench conference, the following colloquy occurred:

26

[Defense Counsel]: Your Honor, if the detective didn't slow it down and he doesn't quite know who slowed it down, cause it might have been he believes, the State's Attorney's Office, I don't think he can testify that it wasn't altered in any other way. How does he know?

THE COURT: Didn't he testify that he's seen both of them and the only difference is the speed?

[Defense Counsel]: That's the only difference, that he's, I mean –

THE COURT: I understand. You can cross-examine if you see anything else, you can certainly cross-examine him.

[Defense Counsel]: – that's fine. Okay. And –

THE COURT: And if, if it would rise to a level of (unintelligible) your observation, then you're going to have to, but it would, it –

[Defense Counsel]: – I just think procedurally.

THE COURT: – and so we've seen both of them and this is the slowed down version. Now I will allow that because it seems to me it's just like showing a plethora of pictures.

[Defense Counsel]: Understood.

THE COURT: And frankly if it, if there's some distortion to it I haven't seen it, I would object from there.

The State moved to admit State's Exhibit 23 and the court ruled, "[s]ubject to the objections noted at the bench, it'll be received." The slow-motion video was played for the jury, during which Detective Patrick described certain movements he observed on the video. There were no further objections or any indication that State's Exhibit 23 differed from State's Exhibit 25 in any way other than it was in slow motion.

In this Court, the appellant argues that the trial court abused its discretion by "admitting the video without sufficient indications of authenticity." He maintains that a

"video may be authenticated under two distinct rules[,]" either the pictorial testimony theory, by which a video may be authenticated through the testimony of a witness with personal knowledge that it fairly and accurately represents the scene or object it purports to depict as it existed at the relevant time, or under the silent witness method, by presentation of evidence describing a process or system that produces an accurate result. According to the appellant, because Detective Patrick did not know who was responsible for slowing down the video or how it was done, there was no basis to authenticate the video. He asserts prejudice by the admission of the video because it was used to show the movement of his and Mr. Davis's feet, in order to prove that he was the initial aggressor in the altercation. We are not persuaded.

"An appellate court typically reviews a trial court's ruling on the admission of evidence for abuse of discretion." *State v. Galicia*, 479 Md. 341, 389 (2022) (citing *Portillo Funes v. State*, 469 Md. 438, 478 (2020)), *reconsideration denied* (Aug. 10, 2022), *cert. denied*, ___ U.S. ___, 143 S. Ct. 491 (2022). *Accord Donati v. State*, 215 Md. App. 686, 708 (2014) ("Determinations regarding the admissibility of evidence are generally left to the sound discretion of the trial court."). Similarly, we review "for abuse of discretion a trial court's determination as to whether an exhibit was properly authenticated." *Mooney v. State*, 487 Md. 701, 717 (2024). *Accord Covel v. State*, 258 Md. App. 308, 322 ("We review the trial court's authentication of evidence for an abuse of discretion."), *cert. denied*, 486 Md. 157 (2023). "A trial court abuses its discretion when 'no reasonable person would take the view adopted by the trial court,' or when the ruling is 'clearly against the logic and

28

effect of facts and inferences before the court.'" *Prince v. State*, 255 Md. App. 640, 652 (2022) (quoting *King v. State*, 407 Md. 682, 697 (2009)), *cert. denied*, 482 Md. 746 (2023).

Authentication is governed, in part, by Md. Rule 5-901. Subsection (a) of that Rule provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Subsection (b) provides "[b]y way of illustration only, and not by way of limitation," various "examples of authentication or identification conforming with the requirements" of the Rule. Those examples include, among other things, "[t]estimony of a witness with knowledge that the offered evidence is what it is claimed to be[,]" circumstantial evidence, "such as appearance, contents, substance, internal patterns, location, or other distinctive characteristics, that the offered evidence is what it is claimed to be[,]" and evidence "describing a process or system used to produce the proffered exhibit or testimony and showing that the process or system produces an accurate result." Md. Rule 5-901(b)(1), (4), and (9).

Recently, in *Mooney*, the Supreme Court of Maryland addressed authentication of video footage, holding that:

> for video footage to be admissible, as with other evidence, there must be sufficient evidence for a reasonable juror to find by a preponderance of the evidence that the video is what it is claimed to be. In other words, the "reasonable juror" test applies to authentication of videos – *i.e.*, for a trial court to admit a video, there must be sufficient evidence for a reasonable juror to find more likely than not that the evidence is what it is purported to be.

487 Md. at 708. Moreover, the trial judge "'need not find that the evidence is necessarily what the proponent claims, but only that there is sufficient evidence that the *jury* ultimately

might do so.'" *Jackson v. State*, 460 Md. 107, 116 (2018) (quoting *United States v. Safavian*, 435 F. Supp. 2d 36, 38 (D.D.C. 2006)) (emphasis in original). "The threshold of admissibility is, therefore, slight." *Id.*

Prior to *Mooney*, Maryland cases had addressed two methods of video authentication. The first is the pictorial testimony method, by which "video evidence is admitted through the testimony of a witness with firsthand personal knowledge[.]" *Covel*, 258 Md. App. at 323 (citing *Washington v. State*, 406 Md. 642, 652 (2008)). The second is the silent witness method, by which a witness speaks "to the reliability and authenticity of the system used to procure the video." *Id.* Under the silent witness theory, a party can authenticate video evidence through the "'presentation of evidence describing a process or system that produces an accurate result.'" *Prince*, 255 Md. App. at 652 (quoting *Washington*, 406 Md. at 652). Testimony under this theory may include the "'type of equipment or camera used, its general reliability, the quality of the recorded product, the process by which it was focused, or the general reliability of the entire system.'" *Reyes v. State*, 257 Md. App. 596, 630-31 (2023) (quoting *Jackson*, 460 Md. at 117). "There is no strict rubric for admitting evidence under the silent witness theory." *Covel*, 258 Md. App. at 323 (citing *Jackson*, 460 Md. at 116). Nor are there "any rigid, fixed foundational requirements[.]" *Jackson*, 460 Md. at 117 (cleaned up).

In *Mooney*, in addition to holding unequivocally that the reasonable juror test applies to the authentication of video footage, the Supreme Court made clear that the "pictorial testimony" and "silent witness" theories are not the only ways to authenticate a

video. 487 Md. at 728. A video may be authenticated under several theories, including through circumstantial evidence under Rule 5-901(b)(4). *Id.* The Court explained:

> Video footage can be authenticated in different ways under the rules governing authentication, including through the testimony of a witness with knowledge under Maryland Rule 5-901(b)(1), circumstantial evidence under Maryland Rule 5-901(b)(4), or a combination of both, as is the circumstance in this case. There need not be a witness with personal knowledge of every single event depicted in a video for the video to be authenticated. What matters is that the proponent of the video must demonstrate that the evidence is sufficient for a reasonable juror to find by a preponderance of the evidence that the video is what it is claimed to be.

*Id.* at 730.

In the case at bar, the trial court did not abuse its discretion by admitting State's Exhibit 23, the slow-motion version of the video footage admitted as State's Exhibit 25. The appellant's arguments that there was no testimony from anyone connected to the place from which the surveillance video was obtained to explain the accuracy or reliability of the cameras or recording equipment and that Detective Patrick "merely testified that he was given access to an older surveillance system and downloaded a video[,]" are not properly before us. There was no objection to the admission of Exhibit 25, the "normal-speed" version of the video. The appellant did not assert at trial, and does not argue on appeal, that there was any difference between Exhibit 25 and Exhibit 23 other than the playback speed. The only argument he makes on appeal that he made below is that he did not know precisely who slowed down the video or how it was done. Detective Patrick testified that other than the change to the speed at which the video was played, there were no changes made to it.

31

The slow-motion version of the video was properly authenticated through a combination of the testimony of Detective Patrick and circumstantial evidence, specifically the normal-speed video that was admitted in evidence without objection and the absence of anything to show that the videos differed in any way other than playback speed. A reasonable juror could have found by a preponderance of the evidence that State's Exhibit 23 was what it purported to be, a slow-motion version of Exhibit 25, the video already admitted in evidence. The trial court did not abuse its discretion by admitting State's Exhibit 23.[9]

### III.

Finally, the appellant contends the trial court violated his due process right to present a defense by restricting his cross-examination of Officer Merriman and excluding a defense witness, Officer Considine, on the basis of relevance.

On cross-examination, defense counsel sought to question Officer Merriman about why he had accompanied Mr. Davis in the ambulance ride to the hospital when the original plan had been for Officer Considine to do so. Officer Merriman testified that Officer Considine "kind of has a weaker stomach than I do" and with "the heat, and all the blood,

---

[9] Even if the trial court had erred in admitting State's Exhibit 23, which it did not, we would find the error harmless. Harmless error occurs when "a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict[.]" *Dorsey v. State*, 276 Md. 638, 659 (1976). Consequently, "errors that do not contribute to a defendant's guilty verdict do not warrant reversal." *State v. Jordan*, 480 Md. 490, 506 (2022). Here, the appellant was not prejudiced by the slow-motion version of the video because the exact same evidence, albeit at normal speed, was admitted without objection. As a result, we can declare beyond a reasonable doubt that the admission of State's Exhibit 23 did not in any way influence the verdict.

and everything[,]" "[h]e wasn't feeling like it – like maybe it was a good idea." When asked whether Officer Considine said he did not want to punch Mr. Davis the entire ride to the hospital, Officer Merriman stated that he did not remember. The State objected to this line of questioning and the following exchange occurred:

> THE COURT: I'm assuming the objection is hearsay.
>
> [Prosecutor]: Yes.
>
> THE COURT: Why is that relevant, with Officer Considine hitting the man.
>
> [Defense Counsel]: It goes to the demeanor, that's why I'm going to ask him why was it –
>
> THE COURT: The witness has already described the demeanor. You can't go into what Officer Considine's conclusion would have been. I mean, Officer Considine might have had great reasons for punching the guy, but that (unintelligible) we can't ask him.
>
> [Defense Counsel]: Okay.
>
> THE COURT: So I'm not going to let you ask that.
>
> \* \* \*
>
> [Defense Counsel]: Well, I can refresh his recollection if he watches the body worn camera.
>
> THE COURT: But why is it relevant why Officer Considine didn't want to ride with him. If it's only relevant to say that Mr. Davis is a jerk and a terrible person, or something along those lines, I don't think that this witness can offer that. It's not real relevant.

The trial judge ruled that defense counsel could not question Officer Merriman about whether Officer Considine did not ride to the hospital with Mr. Davis because he did not want to punch Mr. Davis.

33

After Officer Merriman testified, a bench conference was held about the possibility of the defense calling Officer Considine as a witness:

> THE COURT: Okay.  So the only witness left is potentially Officer Considine or Considine.
>
> [Defense Counsel]: We'll both have to –
>
> THE COURT: And as I, I mean, as I understand it, there's a report somewhere where he says I don't want to ride with the guy because I might punch him.
>
> [Defense Counsel]: He said there's body worn camera.
>
> THE COURT: Okay.
>
> [Defense Counsel]: It's not reported, it's just on the camera.
>
> THE COURT: And why, tell me again why is that relevant.  I'll let you put that on the record.  And I understand the objection is hearsay, but you can (unintelligible).
>
> [Defense Counsel]: I think it goes to his demeanor, Your Honor.
>
> THE COURT: His demeanor meaning Mr. –
>
> [Defense Counsel]: Mr. Davis's demeanor.
>
> THE COURT: Davis.
>
> [Defense Counsel]: Immediately after this alleged incident, how he was behaving and how, how realistic it is that he was the victim of an assault versus the perpetrator of an assault.  And this is a self-defense case, Your Honor.
>
> THE COURT: Mm-hm.
>
> [Defense Counsel]: We are arguing that [the appellant] was defending himself.  And so the other individual's demeanor and how it would –
>
> THE COURT: Mm-hm.

34

[Defense Counsel]: – what it would be and what [the appellant] had to defend against is relevant.

The trial judge permitted defense counsel to make a proffer. Defense counsel played a portion of a recording from a body worn camera in which Officer Considine said, "I don't know if I can handle it without punching him the whole time." The court then sustained the State's objection, concluding that Officer Considine's statement was not relevant.

On appeal, the appellant contends the trial court's ruling was in error because Officer Merriman's statement would have shown that Mr. Davis's demeanor was such that the officer would have wanted to punch him, and that would have tended to show that Mr. Davis "was the aggressor, and not a victim." The appellant asserts that "[t]he fact that a trained police officer, who encounters all kinds of individuals, could not ride in the ambulance with Mr. Davis, would have been highly probative for the jury" and could have created reasonable doubt in the minds of the jurors. He maintains that the bar for showing evidence is relevant is low and was satisfied here.

The Sixth Amendment, made applicable to the States by the 14th Amendment, provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI.[10] This "means more than being allowed to confront the witness physically." *Davis v. Alaska*, 415 U.S. 308, 315

---

[10] Similarly, Article 21 of the Maryland Declaration of Rights provides that "in all criminal prosecutions, every man hath a right . . . to be confronted with the witnesses against him . . . [and] to examine the witnesses for and against him on oath[.]" Maryland courts use the same analysis for confrontation challenges under Article 21 that the federal courts use to analyze the Sixth Amendment. *Cooper v. State*, 434 Md. 209, 232 (2013), *cert. denied*, 573 U.S. 903 (2014). Lewis does not present argument that they should be considered differently here.

(1974). The "main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986) (cleaned up). *See also Ashton v. State*, 185 Md. App. 607, 621 (2009) ("'Central to that right is the opportunity to cross-examine witnesses.'" (quoting *Pantazes v. State*, 376 Md. 661, 680 (2003))).

The Confrontation Clause does not, however, guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Van Arsdall,* 475 U.S. at 679 (quotation marks and citation omitted). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.* It follows that the Confrontation Clause does not alter the general rule that "[a] trial court does not abuse [its] discretion when it excludes cross-examination that is irrelevant." *Simmons v. State*, 392 Md. 279, 296 (2006) (citing Md. Rule 5-402).

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5-401. "Except as otherwise provided by constitutions, statutes, or these rules, or by decisional law not inconsistent with these rules, all relevant evidence is admissible[,]" but "[e]vidence that is not relevant is not admissible." Md. Rule 5-402. "While trial judges are vested with discretion in weighing relevancy in light of unfairness or efficiency considerations, trial judges do not have discretion to admit irrelevant evidence." *State v. Simms*, 420 Md. 705, 724 (2011).

Here, the trial court did not err by excluding the proffered evidence on the ground that it was not relevant. Obviously, Officer Considine made the statement once he arrived on the scene, which was after the stabbing took place. There was no evidence at all to relate Officer Considine's statement to Mr. Davis's demeanor at the time of the altercation between Mr. Davis and the appellant that was the basis for the assault charge. As we have already noted, the trial judge had wide latitude to limit the inquiry into Officer Considine's statement based on concerns about such things as confusion of the issues and issues that are only marginally relevant. *Pantazes*, 376 Md. at 680. It is difficult to conjure how Officer Considine's desire to punch Mr. Davis after the police arrived at the scene could shed light on what happened during the altercation the jury was concerned about. The trial court reasonably decided that the evidence in question did not have a tendency to prove a fact in issue, and therefore was not relevant.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY VACATED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY MONTGOMERY COUNTY.**